UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:13cr 335 (MOC) |
| | ) | |
| | ) | **BILL OF INFORMATION** |
| v. | ) | |
| | ) | Violations: |
| | ) | 15 U.S.C. § 78j(b) |
| **(1) DAWN WRIGHT OLIVARES** | ) | 15 U.S.C. §78ff |
| **(2) DANIEL C. OLIVARES** | ) | 17 C.F.R. § 240.10b-5 |
| | ) | 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 371 |
| | ) | |

FILED
CHARLOTTE, NC
DEC 20 2013
US District Court
Western District of NC

THE UNITED STATES ATTORNEY CHARGES:

At the specified times and at all relevant times:

### Introductory Allegations

1. From in or about January 2010 through in or about August 2012, defendants DAWN WRIGHT OLIVARES and DANIEL C. OLIVARES and others unnamed in this Bill of Information, and known and unknown to the United States Attorney, ("the co-conspirators") engaged in an over $850 million "Ponzi" scheme through a sham internet based penny auction company named Zeekler and its purported advertising division ZeekRewards (collectively "Zeek"), by representing that victims would receive a bogus 125% return on investment.

2. The co-conspirators falsely represented that Zeekler was generating massive profits from its penny auctions and that the public could share in such profits through investment in ZeekRewards. In truth and fact, Zeekler's purported profits were bogus and ZeekRewards operated as a fraudulent Ponzi scheme whereby the co-conspirators used monies from victim-investors to pay fraudulent returns to earlier victim-investors and to personally enrich themselves.

3. As a result of the co-conspirators' scheme and artifice to defraud, victims worldwide, including over 1,500 victims in the Charlotte, North Carolina area, sustained losses of at least $750 million.

### Relevant Entities and Individuals

4. Un-indicted co-conspirator P.B., a resident of North Carolina, owned Rex Venture Group, LLC ("RVG") through which he owned and operated Zeekler and ZeekRewards. P.B.

1

was President of Zeekler and ZeekRewards, which maintained offices in Lexington, North Carolina and elsewhere.

5. Defendant DAWN WRIGHT OLIVARES, a resident of Arkansas, was closely involved in the strategic operations of Zeekler and ZeekRewards and ultimately served as Zeek's Chief Operations Officer. DAWN WRIGHT OLIVARES was the 95% owner of Wandering Phoenix LLC, a company that she used, among other things, to receive payments from Zeek and RVG.

6. During the relevant time period, defendant DANIEL C. OLIVARES, the step-son of DAWN WRIGHT OLIVARES, was RVG's senior technology officer and was responsible for, among other things, database design, management and operation for Zeekler and ZeekRewards.

## Scheme & Artifice to Defraud

7. P.B., DAWN WRIGHT OLIVARES, DANIEL C. OLIVARES, and others represented that victim-investors in ZeekRewards could participate in what came to be known as the Retail Profit Pool ("RPP") which supposedly allowed victims collectively to share up to 50% of Zeek's net retail profits.

8. The co-conspirators falsely represented that Zeek was generating massive retail profits. Indeed, the co-conspirators claimed that they calculated and shared with investors the "daily net profit," which supposedly represented 50% of that day's net retail profits, or half of the net retail profit of Zeek.

9. In truth and fact, the "daily net profit" was not half the net retail profit of Zeekler and had no relationship to actual penny auction revenues or retail profits. Moreover, the co-conspirators did not keep books and records needed to calculate such a figure, rather, P.B. simply made up the "daily net profit" without any reference at all to retail sales.

10. The true revenue from the scheme--- approximately 98% of all incoming funds--- came from victim-investors rather than the claimed massive retail revenue and profits from the penny auctions.

11. Victims invested in ZeekRewards' RPP in the following manner:

   a. Through the purchase of "VIP Bids" in increments of no greater than 10,000, each VIP Bid being sold for $1. Initially, victim-investors were promised that they would receive a return on investment of 125% on each VIP Bid purchased.

   b. Thus the VIP Bids were represented as functioning like shares of Zeekler stock.

   c. Each share could be purchased for $1, and entitled the victim-investor to a pro rata share of up to 50% of the supposed net retail profits of Zeekler.

2

d.  However, the co-conspirators promised that these "bids" were special because victim-investors would receive a 125% return on investment for each bid.

e.  Indeed, by rigging the "daily net profit" figure, the co-conspirators ensured that the shares returned or even exceeded the promised 125% return.

f.  In order to participate in the RPP, victim-investors were also required to place a daily ad to purportedly attract new participants to the penny auctions and to pay a monthly investment fee. The investment fee was collected in the form of a monthly subscription ranging from $10 to $99. The co-conspirators designed and implemented various automated programs so that investors could easily meet the daily ad requirement.

12.  During the relevant time period, the co-conspirators generated over $97 million from such investment fees and over $800 million in additional funds from VIP Bids.

13.  The co-conspirators used this money, in Ponzi-like fashion, to pay other victim-investors in the scheme and to personally enrich the co-conspirators.

14.  In order to further the Ponzi scheme, P.B., DAWN WRIGHT OLIVARES, DANIEL C. OLIVARES, and others encouraged victim-investors to leave money in the ZeekRewards' RPP by allocating an "80/20" VIP Bid strategy. Under this strategy, 80% of the purported daily earnings would remain in the RPP to be re-invested through the purchase of more VIP Bids and the remaining 20% would be withdrawn as cash. The co-conspirators promoted this allocation strategy so that, among other things, they would have adequate cash on hand to make the daily Ponzi payments to victim-investors. This 80/20 strategy also caused the VIP Bid point balance to grow exponentially. Specifically, by August 16, 2012, there were approximately 3 billion outstanding VIP Bid points in the RPP.

15.  P.B., DAWN WRIGHT OLIVARES, DANIEL C. OLIVARES, and others induced additional victims to invest through the purchase of subscriptions through a multi-level marketing commission program called the "Matrix." Under the Matrix, participants earned commissions and bonuses based on, among other things, signing up new VIP Bid and subscription purchasers. The commissions and bonuses paid out of the Matrix were in addition to the Ponzi payments generated from the ZeekRewards RPP. The source of the money used to pay these commissions and bonuses primarily came from victims who invested through the purchase of VIP Bids and monthly subscriptions.

16.  As the Ponzi scheme grew in size and scope, the co-conspirators took several steps to conceal the true nature of the Ponzi scheme by making a series of cosmetic changes to the ZeekRewards' RPP. For example:

a.  Initially, the co-conspirators called the RPP the "compounder" and touted it as way to obtain a 125% "rebate" or "return on investment" on the purchase of "compounding bids." Over time, the co-conspirators attempted to eliminate references to the terms "compounder," "compounding bids," and 125% "return on investment," all in a fraudulent effort to conceal the true nature of the Ponzi scheme.

3

b.  At some point, instead of specifically promising a 125% return of investment on each dollar invested through the purchase of a VIP Bid, the co-conspirators used bogus daily net profit figures to reach that goal.

　　i.  These bogus daily net profit figures were generally provided by P.B. to DANIEL C. OLIVARES and were always approximately 2% for Monday through Thursday and approximately 1% for Friday through Sunday.

　　ii.  These figures were not based on any actual profits, and the co-conspirators often re-used bogus daily profit figures from preceding days to report that new day's purported profits.

　　iii.  The purported net daily profit was designed to, among other things, continue to generate a bogus 125% return on investment for each dollar invested through the purchase of a VIP Bid.

c.  Concerned that the RPP would be viewed as a "passive investment activity," the co-conspirators later conditioned the receipt of payments for some investors on giving away VIP Bids. In truth and fact, the co-conspirators designed and implemented various automated programs so that investors could instantly give such bids away upon the purchase of a VIP Bid thereby further concealing the true nature of the Ponzi scheme.

17.  Ultimately, the Ponzi scheme began failing because the outstanding liability to victims resulting from the bogus 125% return on investment continued to rise beyond control.

18.  Indeed, by August 16, 2012, there were approximately 3 billion outstanding VIP Bid points in the RPP, which the co-conspirators fraudulently represented to victims as worth approximately $2.8 billion. Yet, the co-conspirators had no accurate books and records to even determine how much cash on hand was available to redeem the victims' VIP Bid points.

19.  In truth and fact, by August 17, 2012, the co-conspirators had only $320 million, (approximately 11% of $2.8 billion) available to redeem the victims' VIP Bid points.

20.  During the relevant time period, the co-conspirators personally enriched themselves with victim funds by diverting the following approximate amounts:

a.  $10.1 million to P.B.;

b.  $7.2 million to DAWN WRIGHT OLIVARES and Wandering Phoenix; and

c.  $3.1 million to DANIEL C. OLIVARES.

## Tax Fraud Conspiracy

21.   P.B., DAWN WRIGHT OLIVARES, and others paid themselves large salaries and other payments from victim-investors' funds and did not keep accurate and complete records of the payments.

22.   P.B., DAWN WRIGHT OLIVARES, and others used multiple bank accounts and internet based electronic payment services ("e-wallets"), including e-wallets located outside of the United States, to deposit funds from victim-investors and to make Ponzi payments to victim-investors and did not keep accurate and complete records of these accounts and services

23.   Rex Venture Group, ZeekRewards, and Zeekler failed to file any corporate tax returns or any corporate tax payments to the IRS.

24.   For tax year 2011, P.B., DAWN WRIGHT OLIVARES, and others issued many IRS Form 1099s to victim-investors that purportedly reported the "income" received by the victim-investors for their participation in the scheme. However, in truth and fact, the vast majority of the income reported to the IRS was fictional and had neither been earned nor received by the victim-investors.

   a.   In total, P.B., DAWN WRIGHT OLIVARES, and others reported to the IRS income by the victim-investors of over $108 million for the year 2011 on the 1099s issued, while ZeekRewards actually paid out less than approximately $13 million in cash to victim-investors during that year.

   b.   As a result, victim-investors filed false tax returns with the IRS reporting phantom income that they never actually received, and P.B., DAWN WRIGHT OLIVARES, and others were able to use the false tax notices to perpetuate the Ponzi scheme.

5

## COUNT ONE
### (Investment Fraud Conspiracy)

25.  The United States Attorney realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 24 of the Bill of Information, and further alleges that:

26.  From in or about January 2010 through in or about August 2012, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendants,

**(1) DAWN WRIGHT OLIVARES, and
(2) DANIEL C. OLIVARES,**

did knowingly combine, conspire, confederate, and agree with P.B., and others unnamed in this Bill of Information, and known and unknown to the United States Attorney, to commit offenses against the United States, including violations of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud); and Title 18, United States Code, Section 1343 (wire fraud).

### Manner and Means

27.  The conspirators carried out the conspiracy in the manner and means described in paragraphs 1 through 24 of the Bill of Information, among others.

### Overt Acts

28.  In furtherance of the conspiracy, and to accomplish the objects thereof, DAWN WRIGHT OLIVARES, DANIEL C. OLIVARES, and their conspirators committed one or more overt acts in the Western District of North Carolina and elsewhere, described in paragraphs 1 through 24 of this Bill of Information.

All in violation of 18 U.S.C. § 371.

## COUNT TWO
### (Tax Fraud Conspiracy)

29. The United States Attorney realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 24 of the Bill of Information, and further alleges that:

30. From in or about January 2010 through in or about August 2012, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

### (1) DAWN WRIGHT OLIVARES

did unlawfully, voluntarily, intentionally and knowingly conspire, combine, confederate, and agree together and with other individuals both known and unknown to the United States Attorney to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue: to wit, income taxes

### Manner and Means

31. The conspirators carried out the conspiracy in the manner and means described in paragraphs 1 through 24 of the Bill of Information, among others.

### Overt Acts

32. In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed in the Western District of North Carolina, and elsewhere:

    a. During 2012, Defendant and her co-conspirators filed or caused to be filed false IRS Forms 1099 in the names of victim-investors with the IRS which reported fictional income;

    b. During 2011 and 2012, Defendant and her co-conspirators opened numerous bank accounts and used e-wallets, including e-wallets based in foreign countries, to receive payments in the scheme.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

33. Notice is hereby given of the provisions of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by § 981(a)(1)(C). The defendant has or had a possessory or legal interest in the following property that is subject to forfeiture in accordance with section 982 and/or section 2461(c):

    a. all property involved in the violations alleged in this bill of information;

    b. all property which is proceeds of such violations; and

    c. in the event that any property described in (a) and (b) cannot be located or recovered or has been substantially diminished in value or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant, to the extent of the value of the property described (a) and (b).

34. The following property is subject to forfeiture on one or more of the grounds stated above:

    a. all currency and monetary instruments constituting or derived from proceeds traceable to the scheme alleged in this bill of information, including but not limited to the sum of approximately $850 million in proceeds.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

_/s/ M. Odulio_
MARK T. ODULIO
ASSISTANT UNITED STATES ATTORNEY

_/s/ Jenny G. Sugar_
JENNY G. SUGAR
ASSISTANT UNITED STATES ATTORNEY